WRIGHT v. PACIFIC COAST OIL CO.

S. F. No. 828; July 27, 1898.

53 Pac. 1086.

**Employer's Liability.**—Plaintiff had Been for Seven Years in Charge of stills for distilling petroleum, and inspected the bottoms, and notified defendant, the owner, when they were to be replaced. The life of a bottom was about five and a half months, and at the end of four months he would begin inspections, making them after every run. He knew the danger of the bottoms giving way, and whether they had been regularly inspected. A crack being discovered in a bottom, plaintiff and the superintendent knelt down and looked at it, neither thinking of any danger. At the superintendent's suggestion, plaintiff then proceeded to remove a burner to prevent the oil in it being caked, and while standing in front of the still the bottom gave way, and a quantity of asphaltum ran out, burning plaintiff. Held, that the injury was caused by an unforeseen accident, resulting from the inevitable impairment of the still, of which plaintiff had equal means of knowing with defendant, and he could not recover.

APPEAL from Superior Court, Alameda County; John Ellsworth, Judge.

Action by W. H. Wright against the Pacific Coast Oil Company. There was a judgment for plaintiff, and from the judgment and an order denying a new trial defendant appeals. Reversed.

Van Ness & Redman for appellant; Tappan & Simpson for respondent.

HAYNES, C.—This appeal is by the defendant from the judgment and an order denying its motion for a new trial. The defendant is a corporation engaged in the business of refining lubricating and illuminating oils, and in November, 1895, the defendant was in its employ as a "stillman," and while so employed received personal injuries, and prosecutes this action to recover damages therefor. Upon the premises of defendant there were eight small vats or stills which were operated by the plaintiff. These stills are circular, are seven feet in diameter and about five feet high. They rest on a brick foundation three or four feet high, and are inclosed with brick, forming a jacket. The bottom of the still is formed of a sheet of steel riveted to the base of an angle iron, and the sides are riveted to the perpendicular part, thus forming a vat shaped like a tub, the top, or cover, having a manhole, through which access may be had to the inside. About eighteen inches below the bottom is a grate upon which coke is placed, and where the fire, fed by an oil spray, burns. These stills are filled with petroleum to within about a foot of the top. The oil is heated to a high temperature, and the vapors are conveyed by pipes to the receiving house, and condensed. When the process is completed the oil is evaporated away until only the asphaltum is left, and that is coked on the bottom of the still. When sufficiently cooled, the asphaltum is dug out, and the still is charged for another run. The process ordinarily requires eighteen or twenty hours to bring the contents down to a coke, and the cooling, cleaning out and recharging occupy the remainder of two days. The bottom of the still, being exposed to great heat, lasts about five or five and a half months, and when a new bottom is required the still is taken down, and the rivets connecting the bottom with the angle iron are cut, and a new bottom put in. The greatest heat being at the center, that part is first to wear out. The bottom soon begins to sag at that point, and the sag increases

the longer it is used, and as the bottom becomes thin minute cracks are made, through which a seepage or sweating occurs, creating a moisture on the bottom when a new charge is put in or before it is fired up. After a bottom had been used about four months inspections of the bottom began to be made by the stillman by pumping a quantity of oil into the still, and then going under it with a torch and examining the bottom. If it was found to be moist, it was deemed insufficient for another run, and would be reported by the stillman to the superintendent, who would either direct a new bottom to be put in, or have the boilermaker test it with a hammer to ascertain its strength.

The circumstances more immediately connected with the accident are that the plaintiff was in the receiving-house, and was informed by another employee that one of his stills was on fire. The plaintiff testified that he ran to the still and found a dense smoke pouring out, and immediately opened the damper, thus allowing the smoke to pass up the flue. He then opened the furnace doors, and, kneeling down, looked at the bottom of the still, and observed a small crack near the center of the bottom, through which he says he saw oil dropping down into the fire box. That he looked at it for a very brief space of time, and got up off his knees, and found the rest of the employees there, and Mr. Miller, the superintendent. That he and Miller both got down and saw the crack and what was going on. Then both stood up quietly for a second or so, and the superintendent said: "Well, I guess it won't get any worse; I guess it will take up"; and directed the other employees to go about their work, and then said to the plaintiff: "Wright, you disconnect that burner." That he went and got a pair of tongs to disconnect the burner (which fed the oil to the fire under the still), and gave it one or two turns to loosen it, and then took his hands to it. That he was standing in front of the furnace doors, which were then closed, when he heard a great roaring sound, and was immediately enveloped in flames. His hands were badly burned, and his face to some extent. The oil had been shut off from the burner by some one at the first alarm. The immediate cause of the flame bursting out was that a hole was broken in the center of the bottom of the still, letting

a quantity of the asphaltum or refuse fall on the coke fire underneath.

The principal controversy as to the facts relates to the removal of the burner, in which the plaintiff was engaged at the time he was burned. The plaintiff testified that he was ordered to remove it, and Mr. Miller testified that he said to him: "If you take off the burner, it will save from carbonizing." The burner consists of a small pipe which conveys the oil into the furnace, that pipe being inside of a larger one, which conveys steam. The steam-pipe is drawn to a nozzle, and is grooved or rifled spirally on the inside, thus spraying the oil. These pipes, or burner, are twelve or fifteen inches long, projecting a few inches inside the furnace wall. The reason for removing it was that when the oil and steam were shut off some oil would be left in the burner, and the heat of the furnace would evaporate the pure oil, and leave a residuum which would carbonize, or coke, and thus clog the burner to some extent, and cause trouble in cleaning it out. The burners are sometimes taken off during the run for the purpose of cleaning or adjustment. The plaintiff testified that removing the burner would prevent coking, and that "the taking off the burner had nothing to do with the flame shooting out— nothing whatever. I did not make any protest against taking off the burner when Mr. Miller directed me to do it. I had no objection to that. I did not regard it as an improper thing to do, under those circumstances." Upon being asked how long it would require to stand there to take the burner off, he replied: "Half a minute."

The plaintiff had been in defendant's employment about ten years, and for seven years next before the accident had been in charge of these stills. He testified that he had never been instructed to examine the bottoms of the stills with a torch, but had always done so out of a desire to make himself useful and to retain his place. The superintendent testified that the stillmen were always instructed to do so; that it was part of their duty; that the boilermaker who put in the bottoms never examined the stills unless the stillman reported that they required attention; and this is not denied by the plaintiff, nor does he deny that it was always understood to be his duty.

Upon his examination in chief the plaintiff, after describing the mode of examination with a torch, was asked: "Did you make such an inspection as you describe on this particular still prior to the accident? A. Yes, sir. Q. How long prior? A. Couple of weeks. Q. With what result? A. Found nothing that would indicate the necessity of reporting that it was played out, or gone in." Plaintiff further testified: "The bottom becomes very thin in course of time from being used over the fire. They get down almost as thin as a piece of paper. After they have been in use about four months I begin to inspect them to see whether or not there is any sweating or seepage underneath. If they are wet underneath, then I don't use them. I notify Mr. Miller that that bottom needs to be taken off and a new one put on, and Mr. Miller has Mr. Bird do it. . . . . I cannot recall that Mr. Miller ever gave me any specific instruction to do that. I knew it was expected of me. I can't recall how I came to get into the habit of inspecting. I had been doing that, adopting that method, for fully four or five years. . . . . It gradually came to be understood to be a portion of my duties to examine the bottoms before using them; everybody so understood it."

An explanation made by Mr. Miller throws light upon this method of inspecting the stills. These bottoms are made of steel, and when new are five-sixteenths of an inch in thickness. So long as the contents of the still remain in a liquid state the fire does not injure the bottoms; but when it is no longer a liquid, in the coking stage, the bottom is brought to a white heat and is slowly burned away. The first cracks occur in the cooling process, and, if any exist, upon putting in the cold petroleum and before the fire is started, the sweating or moisture on the outside of the bottom shows them, even when they cannot be seen or otherwise detected; and, if no moisture appears, it is known to be good for another run, since the cracks will not occur until the next cooling takes place. Hence the necessity for regular inspection, when from the age of the bottom, or its sagging in the center, weakness is indicated. In this case the bottom was found to be scarcely thicker than tissue paper.

It is therefore apparent, first, that it was plaintiff's duty, under his employment as stillman, to inspect these bottoms

when they had been in use about four months, and regularly thereafter, and, when cracks were indicated by the moisture, to report to the superintendent; and, second, having decided, as he must have done by making an inspection at about the regular time, that his duty required him to commence the inspection of this particular still, it was his duty to continue these inspections; and, if it was his duty to commence the inspection two weeks before the accident, it was negligence on his part to omit it during the whole of that time, the still being freshly charged every second day, thus furnishing six or seven opportunities for inspection after the one made and before the accident. Upon this point he testified: "When the convexity began to get considerable, and I knew that the still had been in a period of four months or thereabouts, I would make it my business, after every charge had been cleaned out, to put in one or two barrels of oil, shut off the supply, and go down and make this examination with a torch, and not until I discovered seepage would I report. I might be making these examinations a couple of weeks or longer before the seepage would manifest itself. The seepage was the customary and usual test." Much more of the testimony of the plaintiff, as well as of other witnesses, might be quoted, tending to show that it was the duty of the plaintiff to inspect and report to the superintendent the condition of the stills. Upon that question there is no conflict.

At the conclusion of the evidence on behalf of the plaintiff, the defendant moved for a nonsuit upon the ground that the evidence failed to show any actionable negligence upon the part of defendant, and while said motion was under discussion plaintiff asked and obtained leave to amend his complaint. The original complaint alleged that it was not his duty to have control or supervision of the stills, and that he did not exercise any custody or supervision over them; that said vat or still was imperfectly constructed, defective, inadequate and unsafe; that such unsafe condition could have been discovered by the defendant by the exercise of ordinary care, and was unknown to the plaintiff; that while he was engaged in heating oil and standing in front of said vat, which was filled with oil, it cracked across the bottom by reason of the imperfection and defectiveness aforesaid, and thereby the contents of the vat ran

out and burned the plaintiff. The amendment added, in substance, that while the vat was in said cracked and unsafe condition, which was unknown to the plaintiff, the defendant, knowing its contents, negligently, and without the exercise of common prudence, ordered plaintiff to remove a certain burner which was located above the furnace door, and while plaintiff, in the execution of said order, was standing in front of the furnace door, the vat cracked entirely across the bottom, and the contents ran out, etc. Defendant objected and excepted to the order permitting the amendment. The motion for a nonsuit was renewed, with the statement, in addition to the former, that the averments of the amendment are not justified by the evidence, and that no negligence on the part of defendant is shown. The nonsuit was denied, and defendant excepted.

It would seem to be clear that in the absence of the amendment the nonsuit should have been granted. So far as the condition of the vat or still is concerned, no negligence on the part of the defendant is shown, while the testimony of the plaintiff is clear and explicit that it was his duty to examine the bottom of the still and report its condition to the superintendent. Whether that duty was originally imposed upon him as a part of his employment, it is not necessary to inquire. He had assumed it, if it was not imposed upon him, and continued it for at least four or five years, and knew that it was expected of him. If at any time he concluded it was too burdensome, or the responsibility too great, he should have informed the superintendent, and given him an opportunity either to employ someone as stillman who would perform the duty, or otherwise provide for its performance. The citation of authorities to this proposition would be superfluous. There is not one word of testimony tending to show that the vat was improperly or imperfectly constructed, or that it was defective, inadequate or unsafe, save from use, as to which it was the duty of plaintiff to watch and report.

I do not think it necessary to discuss or determine the question whether the court erred in permitting the plaintiff to amend his complaint; for, conceding that the amendment was properly allowed, no case was made thereunder which would justify a verdict for the plaintiff. The plaintiff testified that the removal of the burner had nothing to

do with the fire or the giving way of the bottom of the still. The only possible connection it had with the accident was that it brought him for about "a half minute" in front of the furnace doors. Giving the plaintiff the benefit of the doubt as to whether the removal of the burner was ordered, or merely suggested, by the superintendent, it does not appear that the plaintiff had not as full knowledge of any possible danger as the superintendent. He had been for seven years in charge of these stills. No one, whatever his station, could be more familiar with them. Indeed, no one knew so well as the plaintiff whether there was danger of the bottom of the still giving way. He knew how long it had been in use, and he alone, so far as the evidence discloses, knew whether or not it had been regularly inspected. Before the superintendent reached the still, plaintiff had opened the furnace doors, kneeled down in front, looked at the bottom of the still, and testifies that he saw a small crack about an inch long and about as thick as a knife blade. When the superintendent arrived he and the plaintiff both got down in front of the furnace and looked at the bottom, and the crack seemed to be closing. Neither of them appears to have apprehended any danger to themselves. The superintendent certainly did not, as he had a right to believe that it had been inspected when the still was filled at the beginning of the run, and therefore, though leaking, was sufficiently strong to sustain the weight within. There was no intention of continuing the run of that still. The oil spray had been turned off, though the coke was still burning, and the bricks were red hot. Nothing could be done but to let the fire burn out and the still cool. The removal of the burner was solely to prevent the oil within it being coked by the heat of the furnace, and was regarded by the plaintiff as a proper thing to do under the circumstances.

At the time of the accident the run was approaching completion. The contents of the still were reduced to twelve or fourteen inches of asphaltum. The small crack which was seen by the plaintiff only leaked "a little thin spray," and, according to the testimony of the plaintiff, Mr. Miller said it would take up. "Take up is the equivalent of cake up, or coke up." The accident did not occur because of anything, whether gas or oil, that escaped through that crack,

or that could by any possibility escape through it in the condition of the contents of the still, which had been reduced to twelve or fourteen inches of asphaltum. The conduct of both the plaintiff and Mr. Miller in getting down with their faces before the furnace door and watching it is conclusive of that fact, as the red or white heat of the bottom showed that the contents were reduced to a thick condition, which could not pass through a crack such as the plaintiff described. The accident was caused by a portion of the bottom, about the size of a man's hat, breaking out in the center of the bottom, and thus permitting a quantity of the asphaltum to fall upon the coke fire underneath. That was an occurrence which neither of them anticipated, and which, if likely to occur, should have been more readily anticipated by the plaintiff, who had the better opportunity of knowing the condition of the still, and whose duty it was to watch and report its condition whenever he deemed it unsafe. It was not the case of a latent defect in the material or construction of the still, but a case where the still wears out from use, and is under the immediate care of the employee who is charged with the duty of ascertaining and reporting its condition to his employer.

These works had been in operation, under the supervision of Mr. Miller, some sixteen years, and during all that time the same tests as to the sufficiency of the still bottoms had been used without accident. The plaintiff was not a new or inexperienced man. He had been in charge of these stills for seven years. He had not only an equal opportunity of knowing the condition of this particular still, but a better opportunity than the superintendent. That neither apprehended danger to the person is clear, not only because both got down in front of the furnace to inspect it, but because the plaintiff not only acquiesced in the direction to remove the burner, but testifies that he regarded the order as proper under the circumstances. Even if it were conceded that plaintiff had continued to make the torch inspections of the bottom up to the time the last charge was put in the still, we see no negligence or fault upon the part of the superintendent of which the plaintiff can complain. The plaintiff's actual knowledge was at least equal to that of the superintendent, while his means of knowledge were greater. Where an employee, with his own consent, has undertaken,

as a part of his employment, the duty of determining when an appliance which he constantly uses has become unsafe or insufficient from such use, and especially where he has shown himself capable, from long experience, to do so, he cannot hold his employer liable for an unforeseen accident resulting from its expected and inevitable impairment. One of the essential conditions of the right of recovery in case of defective appliances is "that the servant did not know of the defect, and had not equal means of knowing with his master": Wood, Mast. & Serv., sec. 414; Malone v. Hawley, 46 Cal. 409. This seems to have been understood by the plaintiff to be the law, since in his amended complaint he alleges that defendant knew the dangerous condition of the vat, and that he did not. The evidence does not sustain this allegation. Plaintiff testified that the average life of the still bottoms was from five to five and a half months. He had been in charge of these eight stills for seven years, and therefore he had probably seen at least one hundred and twelve of these bottoms worn out and replaced. In Shearman & Redfield on Negligence, section 287, it is said: "The true definition is that, when circumstances make it the duty of the servant to inquire, it is contributory negligence on his part not to inquire. A servant is charged with actual notice as to the matters concerning which it was his duty to inquire; and especially should this rule be applied where the servant's action is founded upon the assumption that the master ought to have known of something which he did not actually know."

It is true the superintendent saw the crack from which he testified he saw gas escaping; but he further testified that that frequently occurred, and no evil results or dangers followed; that cracks appeared during the coking part of the process, when the still bottom had ample strength to sustain the weight resting upon it; and that, in an experience of about twenty-five years in the oil-refining business, he had never before known of such an accident occurring; and that, if no cracks were shown by sweating or seepage when the still was charged with cold oil before the fire was started, it was always considered safe for the run, unless the sagging of the bottom was unusual; and as to the condition of the still at the time it was charged for that run the plaintiff had, or should have had, full knowledge, while the superintendent had no knowledge, and had a right to rely upon plaintiff

having discharged his duty in that regard, and we have already seen that the giving way of the bottom was wholly unexpected by both. If, therefore, we assume that the plaintiff had continued his inspection after each run, as it was his duty to do, and found no indications of dangerous weakness at the time the still was charged, neither the plaintiff nor the defendant were guilty of any negligence, and in such case there is no liability; and, if the inspections were not continued by the plaintiff, the superintendent, having the right to rely upon the plaintiff having discharged his duty and made the required inspection at the beginning of the run, was, through the fault of the plaintiff, in ignorance of facts essential to the formation of an intelligent opinion as to the condition of the still, and whether or not there was danger in being near it. Several exceptions were taken to instructions given to the jury, some of which we think were rightly taken, but, in view of the full discussion of the case, we think it not necessary to discuss them here. They will sufficiently appear from what has been said. We advise that the judgment and order appealed from be reversed.

We concur: Belcher, C.; Searls, C.

PER CURIAM.—For the reasons given in the foregoing opinion the judgment and order appealed from are reversed.